**In re FAMILY HEALTH SERVICES, INC., et al., Debtors.**

**In re MAXICARE HEALTH PLANS OF THE MIDWEST, INC., Debtor.**

Bankruptcy Nos. SA89–01549JW, SA89–01550JW through SA89–01594JW, SA89–02535JW, SA89–02536JW and SA89–01551JW.

United States Bankruptcy Court,
C.D. California.

July 25, 1989.

See also, Bkrtcy., 104 B.R. 279.

Myerson & Kuhn, Los Angeles, Cal., for debtors.

Fagel, Haber & Maragos, Chicago, Ill., for John E. Washburn, Director of Ins. of the State of Ill.

Bingham, Summers, Welsh & Spilman, Indianapolis, Ind., for Bettye Foy, Acting Com'r Indiana Dept. of Ins.

Climaco, Climaco, Seminatore, Lefkowitz & Garofoli Co., L.P.A., Cleveland, Ohio, for George Fabe, Superintendent of the Ohio Dept. of Ins.

Pagter Law Corp., Santa Ana, Cal., Sp. Counsel to George Fabe, Superintendent of the Ohio Dept. of Ins.

Sidley & Austin, Los Angeles, Cal.; for the Official Bondholders' Committee.

Milbank, Tweed, Hadley & McCloy, Los Angeles, Cal., for IBJ Schroder Bank & Trust Co.

Danning, Gill, Gould, Diamond & Spector, Los Angeles, Cal., for the Creditors' Committee.

## MEMORANDUM OF DECISION

JOHN J. WILSON, Bankruptcy Judge.

This matter comes before the Court on the motions of the Director of Insurance for the State of Illinois, Commissioner of Insurance for the State of Indiana and the Superintendent of Insurance for the State of Ohio (Regulators) to dismiss the petition filed by Maxicare Health Plans of the Midwest, Inc. (Maxicare Midwest), for relief under Chapter 11 of the Bankruptcy Code. Group Health Association of America filed an amicus curiae brief in support of the motions. The debtor and the Bondholders Committee opposed the motions and IBJ Schroeder Bank & Trust Co., a member of the Bondholders Committee, filed a response supporting the debtor's position.

This is one of a number of motions to dismiss filed by state insurance regulators in the Maxicare cases. The first opinion issued by the court was *In re Family Health Services, Inc. et al./In re Maxicare North Texas, Inc.* and much of the court's analysis in that decision is repeated here.

## BACKGROUND

Family Health Services, Inc. and 45 related corporations, including Maxicare Midwest, filed for relief under Chapter 11 of the Bankruptcy Code on March 15, 1989. Subsequently, two affiliated corporations also filed Chapter 11 petitions. The 48 cases were consolidated for joint administration under Family Health Services, Inc., however, the debtors are commonly and collectively known as "Maxicare." According to the petitions, assets of Maxicare total $2.1 billion and liabilities are $1.4 billion. It appears that there are in excess of 100,000 creditors plus an unknown number of the one million members of Maxicare health plans who may have claims. Maxicare operates a national network of health maintenance organizations (HMOs) which furnish health care services to approximately one million people. Plan members (also called enrollees) pay a fixed monthly fee, usually through their employer, and are eligible for all covered routine and emergency medical services. Hospitals, doctors, and individual health care professionals provide services to plan members under two fee arrangements with Maxicare. A health care provider agrees either to deliver medical care for a fixed monthly charge, a "capitation" fee, or to render services on a fee for service basis.

Maxicare Midwest is a member of the Maxicare network. At the top of the Maxicare corporate pyramid is Maxicare Health Plans, Inc., a publicly held California corporation. Maxicare Health Plans, Inc. owns 100% of the stock of Maxicare, Inc., a holding company which is also incorporated in California. Maxicare, Inc. owns 100% of the stock of Maxicare Health Plans of the Midwest, Inc., an Illinois corporation.

Maxicare Midwest, as an HMO in the Maxicare network, constitutes part of a large integrated and interdependent system for the provision of health care to Maxicare enrollees. Maxicare provides essential operational, administrative and managerial services, as well as centralized budget planning and marketing for the entire network of Maxicare HMOs. (Ruegger Decl. Ex. A., pp. 7–8).

The clearest evidence of the interrelationship between the Maxicare entities is Maxicare's cash management system. Maxicare HMOs transmit daily both bills and funds to Maxicare, Inc., Maxicare's California HMO. Maxicare, in turn, uses the funds received to pay debts as they are incurred throughout the Maxicare network. Maxicare also lends money to Maxicare HMOs, with such transfers being recorded on the books and records of the individual HMOs. Further, Maxicare Midwest, along with the other Maxicare entities, submits consolidated financial statements reflecting the overall financial health of the Maxicare network. (Ruegger Decl. Ex. A., p. 17).

Maxicare Midwest is an Illinois corporation doing business in Illinois, Indiana and Ohio. HMOs in Illinois are regulated by the Director of Insurance pursuant to The Illinois Health Maintenance Organization Act. Ill.Ann.Stat. ch. 111½, paras. 1401–1417 (Smith–Hurd 1988 & Supp.1989). In Indiana, the Commissioner of Insurance regulates prepaid health care delivery plans, including HMOs, under Article 8 of the Indiana Insurance Code. Ind.Code Ann. §§ 27–8–7–1 to 27–8–7–21 (Burns 1986 & Supp.1988). The Ohio Superintendent of Insurance regulates HMOs under Title 17 which governs corporations and partnerships. Ohio Rev.Code Ann. §§ 1742.01–1742.37 (Anderson 1985 & Supp.1988). The court approved a sale of the Ohio division of Maxicare Midwest on June 5, 1989.

## JURISDICTION

This court has jurisdiction pursuant to 28 U.S.C. § 1334(a), (d); 28 U.S.C. § 157(b)(2)(A), (O), and general order No. 266 of the United States District Court for the Central District of California.

## ISSUES

The issues are: 1. Is Maxicare Midwest a "domestic insurance company" and therefore not eligible to be a debtor under sections 109(b)(2) and 109(d) of the Bankruptcy Code? 11 U.S.C. § 109(b)(2), (d).
2. Should the Maxicare Midwest petition for relief be dismissed for cause as a "bad faith filing" under section 1112(b)? 11 U.S.C. § 1112(b).

## ANALYSIS

██ Section 109(a) defines who may be a debtor as a person that resides or has a domicile, a place of business, or property in the United States and the term "person" includes individuals, partnerships, and corporations. 11 U.S.C. §§ 109(a), 101(35). The specific exceptions in subsections (b) through (f) of section 109 are the only limits on this broad definition of who may be a debtor.

The applicable subsections of section 109 provide:

(b) A person may be a debtor under chapter 7 of this title only if such person is not—

.    .    .    .    .

(2) a domestic insurance company, ...

.    .    .    .    .

(d) Only a person that may be a debtor under chapter 7 of this title, .... may be a debtor under chapter 11 of this title.

11 U.S.C. § 109(b)(2), (d). Section 109 excludes railroads, domestic insurance companies and banking institutions from eligibility for Chapter 7 relief. In general, to proceed under Chapter 11 an entity must be eligible for Chapter 7 relief.

The Regulators argue that Maxicare Midwest is a domestic insurance company for section 109 purposes. By comparing and contrasting each state's HMO statutes with the laws governing insurance companies, the Regulators contend that Illinois, Indiana and Ohio classify Maxicare Midwest as a domestic insurance company or in the alternative, that Maxicare Midwest is the substantial equivalent of a domestic insurance company. The debtor responds that HMOs in general, and Maxicare Midwest in particular, are not domestic insurance companies as that term is defined by federal case law and the states' regulatory statutes and are, therefore, eligible for Chapter 11 relief.

In determining whether an entity is excluded from seeking bankruptcy relief under section 109, federal courts have fol-

lowed one or more of several approaches. The process of applying traditional rules of statutory construction has come to be known as the *independent classification test.* Courts may consider the classification of an entity under state law, thereby applying the *state classification test.* Finally, at least one court has suggested a third approach and coined the term *alternate relief test.* This court's analysis of the facts under each of these tests leads to the conclusion that Maxicare Midwest is not a domestic insurance company and is therefore eligible for Chapter 11 relief.

## INDEPENDENT CLASSIFICATION TEST

The independent classification test is based upon the court's own construction of the Bankruptcy Code. 2 *Collier On Bankruptcy* ¶ 109.02 (15th ed. 1989). The test is essentially statutory construction by another name. In applying the test, courts have adopted a common sense approach guided by legislative history and traditional rules of statutory construction. *In re Cash Currency Exchange, Inc.,* 37 B.R. 617, 621 (N.D.Ill.1984), *aff'd,* 762 F.2d 542 (7th Cir. 1985), *cert. denied,* 474 U.S. 904, 106 S.Ct. 233, 88 L.Ed.2d 232 (1985).

Beginning with the language of section 109, a "domestic insurance company" may not be a debtor under the Bankruptcy Code. 11 U.S.C. § 109(b), (d). The Code neither defines the term, domestic insurance company, nor mentions health maintenance organizations. Absent a definition, courts have applied traditional rules of statutory construction to determine what entities Congress intended to exclude from bankruptcy relief under section 109.

■ The general rule of statutory construction is that the enumeration of exclusions from the operation of a statute indicates that the statute applies to all cases not specifically excluded. *Expressio unius est exclusio alterius.* 2A *Sutherland Statutory Construction* § 47.23 (Sands 4th ed. 1984). As the Seventh Circuit concluded:

If Congress had intended to make the list of excluded entities illustrative rather than exhaustive, it could have used the rule of statutory construction found in the Bankruptcy Code which provides that the words " 'includes' and 'including' are not limiting." 11 U.S.C. § 102(3). Because Congress chose not to do so, we conclude that the list of excluded entities is intended to be exhaustive.

*Cash Currency,* 762 F.2d at 552.

■ Section 109 broadly defines who may be a debtor subject to a specific and exhaustive list of exclusions. Congress, in choosing to exempt certain organizations from the operation of the bankruptcy laws, must be presumed to narrowly circumscribe the limits of this exemption. *In re Southern Indus. Banking Corp.,* 59 B.R. 978, 982 (Bankr.E.D.Tenn.1986). Absent affirmative action by Congress to expand the application of this provision, section 109 must be narrowly construed.

■ Section 109 of the Bankruptcy Code adopted the insurance company exclusion under the Bankruptcy Act, adding the words "domestic" and "foreign" to clarify when bankruptcy laws may apply to foreign insurance companies. S.Rep. No. 989, 95th Cong., 2d Sess. 31, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5817; H.R. Rep. No. 595, 95th Cong., 1st Sess. 318, *reprinted in* 1978 U.S.Code Cong. & Ad. News 5787, 6275. Former section four of the Bankruptcy Act (11 U.S.C. § 22) provided: "Any person, except a municipal, railroad, insurance, or banking corporation or a building and loan association, shall be entitled to the benefits of this Act as a voluntary bankrupt." 11 U.S.C. § 22 (repealed 1978). The insurance company exclusion was continued essentially unaltered as section 109 of the Code.

Congress chose not to expand or modify the insurance company exception despite two clear opportunities for revision: first, when the Act was codified in 1978 and again, when section 109(b)(2) was amended in 1982.[1] Congress did modify section

---

**1.** It is clear that Congress was aware of the existence of HMOs when the Code was enacted

in 1978. For example, in 1973, Congress passed federal HMO legislation "to provide assistance

109(b) when it expanded the definition of "bank" to include six additional banking entities "or similar institution which is an insured bank." 11 U.S.C. § 109(b)(2). But it did not add similar language to exclude entities that are similar or substantially equivalent to insurance companies.[2] Accordingly, this court finds that HMOs are eligible for bankruptcy relief since they are not specifically excluded by section 109.

Application of the traditional rules of statutory construction to section 109 is dispositive of the primary issue in this case. However, the court takes this opportunity to continue the analysis of these facts under the other tests relied upon by some courts.

### STATE CLASSIFICATION TEST

Under the state classification test the court examines the law of the state of incorporation to determine the character of an entity for section 109 purposes. The analysis begins with whether the state law classifies the entity as one specifically excluded from being a debtor under section 109(b)(2). Next, the court may conduct a functional analysis, comparing the powers of the entity to be classified with those of entities excluded from bankruptcy relief. Finally, the court may examine the state statutes for characteristics common to excluded entities, those entities which conduct business of a public or quasi-public nature and are subject to extensive state regulation including a statutory scheme for liquidation or rehabilitation. *Cash Currency*, 762 F.2d at 548.

Some courts have suggested that the inquiry is complete if the state classifies the entity as one specifically excluded by section 109(b) from being a debtor. *Id.* The Ninth Circuit dealt with this issue in *Security Building & Loan Ass'n v. Spurlock*, 65 F.2d 768 (9th Cir.1933.)

In *Spurlock*, the bankrupt appealed from an involuntary petition which designated the bankrupt as a building and loan association. One month after the petition was filed, the Bankruptcy Act was amended to exclude building and loan associations from eligibility for bankruptcy relief. Absent a definition or other guidance within the Act, the appellate court reasoned that a building and loan association was "entirely a creature of state statute and the statute authorizing its creation must necessarily define its characteristics." *Id.* at 771. The court opinion noted that the name of the debtor and the designation in its articles of incorporation as a building and loan association were persuasive if not controlling evidence of its character, though name alone would not be "determinative." *Id.* Before comparing the articles of incorporation with the state statutes, the court observed that the statute reflected the general conception of a building and loan throughout the United States. *Id.* at 772. The court ruled that the bankrupt was a building and loan association and therefore excluded from bankruptcy relief. Here, however, Maxicare Midwest does not purport to be a "domestic insurance company" in its corporate name, its articles of incorporation or under the laws of the three states. Thus this court's decision is entirely consistent with the Ninth Circuit decision in *Spurlock*.

The Regulators contend that Maxicare Midwest is a domestic insurance company under Illinois, Indiana and Ohio law, and that such classification is dispositive of this dispute. Maxicare Midwest responds that it is regulated under a statutory scheme separate and distinct from domestic insurance companies. It argues that the definitions and provisions of the state laws recognize a fundamental difference between an HMO, which has the power to arrange for health care services, and an insurance company, which indemnifies its policyholders against the cost of such ser-

---

and encouragement for the establishment and expansion of health maintenance organizations." S.Rep. No. 129, 93th Cong. 1st Sess. 4, *reprinted in* 1973 U.S.Code Cong. & Ad.News 3033; 42 U.S.C. §§ 300e to 300e–17.

2. In a similar case involving the bank exclusion, the Seventh Circuit observed that from the failure to include currency exchanges in section 109(b)(2), it may be inferred that Congress intended to make them eligible for bankruptcy relief. *Cash Currency*, 762 F.2d at 552 n. 11.

vice. The Regulators' argument is not persuasive. The three states authorized Maxicare Midwest to conduct the business of a *health maintenance organization.* While it is true that statutes regulating Indiana HMOs are found in the Indiana Insurance Code, that fact alone does not support the conclusion that Indiana HMOs are domestic insurance companies. *In re Prudence Co.,* 79 F.2d 77, 79 (2nd Cir.1935), *cert. denied,* 296 U.S. 646, 56 S.Ct. 247, 80 L.Ed. 549 (1935). All three states specifically empowered Maxicare Midwest to conduct the business of a health maintenance organization, and since none of the three classify Maxicare Midwest as an entity excluded under section 109, i.e. a domestic insurance company, the Regulators' position is without merit.

The Illinois Director of Insurance argues that under Illinois law Maxicare Midwest is a domestic insurance company. Yet, as recently as February 1989, the Deputy Director and representatives of Maxicare Midwest exchanged information regarding the Illinois statutory procedures necessary for Maxicare Midwest to convert to an insurance company. (Ruegger Decl. Ex. A., p. 4; Ex. B., p. 23). Thus the Deputy Director acknowledged that Maxicare Midwest is an HMO not an insurance company. According to the Director, the purpose of the proposed change was to protect Maxicare Midwest from the filing of an involuntary petition under the federal bankruptcy laws. (Reply to Opposition to Motion of the State of Illinois to Dismiss Chapter 11 Case p. 10, n. 3). By attempting to protect Maxicare Midwest from an involuntary bankruptcy proceeding, the Director apparently assumed that Maxicare Midwest is eligible for relief under the Bankruptcy Code. In light of these facts the court finds that Illinois law has treated insurance companies and HMOs as separate and distinct entities. Therefore, under Illinois law Maxicare Midwest is not a domestic insurance company.

■ The statutes of Illinois, Indiana and Ohio also support this conclusion. The individual statutory schemes for regulation of HMOs and insurance companies confirm their separate treatment under the laws of the three states. Illinois insurance companies are regulated according to the Illinois Insurance Code while the Public Health and Safety statutes govern HMOs. Ohio regulates HMOs under Title 17, the corporation and partnership division, while insurance companies must comply with the provisions of the insurance code. In Indiana, HMOs are regulated under the insurance code, however, the Indiana insurance laws generally do not apply to the operation of health maintenance organizations except as specifically provided. Ind.Code Ann. § 27–8–7–17 (Burns Supp.1988). Under the Illinois, Ohio and Indiana statutes, Maxicare Midwest is classified as an HMO, not a domestic insurance company.

The statutory definitions of an HMO and an insurance company confirm their separate nature and individual treatment under Indiana, Illinois and Ohio law. For example, Indiana defines health care insurers as "an insurance company authorized in this state to issue policies that provide reimbursement for expenses of health care services." Ind.Code Ann. § 27–8–11–1 (Burns Supp.1988). In contrast, Ind.Ann.Code § 27–8–7–1 provides:

'Health maintenance organization' means a separate legal entity that operates a prepaid health care delivery plan that has the following provisions:

(1) Payments to the organization for health care services are made on a periodic basis without regard to the dates on which the services are provided.

(2) The amount of each payment to the organization for health care services is fixed without regard to the extent or kind of health care services provided or the number of times that services are provided.

(3) To obtain the benefits provided under the plan, enrollees are required to obtain health care services from certain providers.

Ind.Code Ann. § 27–8–7–1 (Burns Supp. 1988).

Under Illinois statutes, "Insurer" means "an insurance company or a health service corporation authorized in this State to issue

policies or subscriber contracts which reimburse for expenses of health care services." Ill.Ann.Stat. ch. 73, para. 982g (Smith–Hurd Supp.1989). Illinois law defines an HMO as:

[A]ny organization formed under the laws of this or another state to provide or arrange for one or more health care plans under a system which causes any part of the risk of health care delivery to be borne by the organization or its providers.

Ill.Ann.Stat. ch. 111½, para. 1402 (Smith–Hurd 1988).

Under Ohio law, "Health maintenance organization" means "a public or private organization which ... (1) Provides or otherwise makes available to enrolled participants health care services, ..." Ohio Rev. Code § 1742.01(G) (Anderson 1985). These statutes clearly distinguish between HMOs, which provide health care services, and insurance companies, which indemnify against the cost of such services. Therefore, under Illinois, Indiana and Ohio statutes, Maxicare Midwest is classified as an HMO, not a domestic insurance company.

Since Maxicare Midwest is not classified under state law as a domestic insurance company, this court may conduct a functional analysis to determine whether it exercises the same powers as those entities excluded under section 109. For example, in *Cash Currency*, the Seventh Circuit ruled that a currency exchange was not a banking corporation excluded from the jurisdiction of the bankruptcy court because a currency exchange, although similar to a bank in many respects, lacked the statutory power to accept deposits. *Cash Currency*, 762 F.2d at 550. In the case before this court, the powers of an HMO are compared with those of a domestic insurance company to determine whether they are substantially equivalent entities.

The distinctive function of an HMO is the ability to provide medical services to its members, and insurance companies as a rule do not exercise this function. *Jordan v. Group Health Ass'n*, 107 F.2d 239, 247 (D.C.Cir.1939). In considering whether Group Health Association was illegally engaged in the business of insurance, the *Jordan* court recognized the substantial difference between Group Health Association's agreement to provide medical services and an insurance company's contract to reimburse the cost when or after the service is rendered. *Id.* The court focused not on whether risk was involved but on the primary object or purpose of the medical services plan, and determined that Group Health Association was not subject to state insurance laws. *Id.* at 248. Furnishing medical services is clearly not a traditional function of insurance companies.

The central indispensable element of an insurance company is the underwriting or spreading of risk. *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 212, 99 S.Ct. 1067, 1073, 59 L.Ed.2d 261 (1979), *reh'g denied*, 441 U.S. 917, 99 S.Ct. 2017, 60 L.Ed.2d 389 (1979), *cert. denied*, 469 U.S. 1160 (1985). At issue in *Royal Drug* was the validity of price-fixing agreements between pharmacies and a health care insurer. The pharmacies agreed to charge policyholders $2.00 for each prescription drug and receive reimbursement of the cost of acquiring the drug from the insurer. The agreements were entitled to a limited exemption from federal antitrust statutes if the activity was the "business of insurance" for purposes of the McCarran–Ferguson Act. 15 U.S.C. § 1012(b). In defining the "business of insurance," the Court looked to the legislative history of the McCarran–Ferguson Act.

The Supreme Court found that Congress distinguished insurance companies which distribute risk according to hazard, experience and the law of averages, from enterprises, such as manufacturers, which have the ability to control costs. *Royal Drug*, 440 U.S. at 221, 99 S.Ct. at 1078. Since the agreements were arrangements designed to minimize the costs of purchasing goods and services, the Court concluded that the pharmacy agreements were not the "business of insurance." *Id.* at 224, 230, 232, 99 S.Ct. at 1082, 1084. Thus, the ability to control costs, the foundation of the HMO concept, also distinguishes HMOs from tra-

ditional notions of insurance. An HMO can choose the providers of medical services with which it will contract to care for its enrollees. To a great extent Maxicare has contracted with and pays health care providers a fixed sum, which will not increase or decrease in relation to the actual services rendered. For these reasons, an HMO and an insurance company cannot be viewed as equivalents.

The last step under the state classification test is an examination of Maxicare Midwest for characteristics common to entities excluded from bankruptcy relief by section 109(b)(2). These characteristics are regulation under an extensive state statutory scheme, including provision for liquidation or rehabilitation, and the operation of a public or quasi-public business. *Cash Currency*, 762 F.2d at 548.

■ There can be no question that Illinois, Indiana and Ohio laws include statutory schemes for regulation of HMOs and all three include statutes which provide that rehabilitation or liquidation of HMOs shall be considered rehabilitation or liquidation of an insurance company. Ill.Ann. Stat. ch. 111½, para. 1414 (Smith–Hurd Supp.1989); Ind.Code Ann. §§ 27–8–7–17, 27–9–1–1 (Burns 1986 & Supp.1988); Ohio Rev.Code Ann. § 1742.25 (Anderson 1985). Whether or not HMOs are regulated and liquidated under a state statutory scheme, however, is of little assistance in deciding whether an HMO is the substantial equivalent of an insurance company under state law. Maxicare Midwest is not transformed into an insurance company by providing for its liquidation under the supervision of the Illiois Director of Insurance, Indiana Commissioner of Insurance and the Ohio Superintendent of Insurance.

Today's ruling is consistent with other decisions which have given little or no weight to statutory liquidation schemes in applying the state classification test. For example, in *Cash Currency*, the Seventh Circuit held that under the state classification test, a statutory scheme for an entity's liquidation has never been deemed sufficient to classify that entity as one excluded under section 109(b)(2). *Cash Currency,*

762 F.2d at 551; *Prudence,* 79 F.2d at 79. In *Matter of Michigan Master Health Plan, Inc.,* 90 B.R. 274, 277 (E.D.Mich. 1985), the district court held that "as of the date the petition in this case was filed a health maintenance organization certainly was not an insurance company under Michigan state law and is likely still not an insurance company." *Id.* at 275. In reaching this conclusion, the court adopted the following advice of the Michigan Attorney General:

> [T]he Commissioner of Insurance has been designated the state official to act as custodian or receiver of health maintenance organizations and since the Commissioner is already empowered ... to act as custodian or receiver of insurance companies, the *manner* of custodianship and receivership has been extended to health maintenance organizations. At no point in Michigan law is there an attempt to classify health maintenance organizations, which are in effect medical clinics, as insurance companies.

*Id.* at 277. Thus, the courts have rejected the argument that by providing for liquidation of an entity under the banking or insurance laws, the state thereby classifies the entity as one excluded under section 109(b)(2).

The final inquiry is whether HMOs conduct business of a public or quasi-public nature. HMOs provide health care services, an activity which clearly affects the public interest. The comprehensive statutory scheme for regulating and liquidating Illiois, Indiana and Ohio HMOs confirms their legislatures' interest in maintaining the financial stability of HMOs. The Regulators contend that Congress excluded insurance companies, and by analogy HMOs, from federal bankruptcy relief in recognition of the police powers vested in the states to protect the health and welfare of its citizens. But most corporations chartered under state law are subject to the state's police powers, nevertheless, they are eligible debtors under section 109.

The Regulators claim that their departments of insurance are in a superior position to handle the insolvency proceedings

of Maxicare Midwest including assuring the continuity of health care to enrollees. This is no longer a concern in Ohio where enrollees are now served by another HMO pursuant to a sale authorized by the court. The Illinois and Indiana HMOs have continued providing health care services, therefore, the enrollees' interests appear to be adequately protected.

In sum, Illinois, Indiana and Ohio laws do not classify HMOs as insurance companies and HMOs do not possess or exercise the powers of a domestic insurance company. Therefore, Maxicare Midwest lacks the characteristics common to entities excluded from bankruptcy relief. Under the state classification test Maxicare Midwest is not a domestic insurance company for purposes of section 109(b)(2).

The Regulators relied heavily on *In re Portland Metro Health, Inc.*, 15 B.R. 102 (Bankr.D.Or.1981). In that case, Bankruptcy Judge Sullivan determined that the debtor, a health maintenance organization, was a domestic insurance company and therefore, not eligible for relief under the Bankruptcy Code. Portland Metro Health, Inc. operated in two states, Oregon and Washington. A two state operation differs significantly from a national network of HMOs which operated, at the inception of these cases, in about 15 states. In addition, the *Portland* opinion adopted the state classification test, while this court finds the independent classification test decisive. Finally, *Portland Metro* was decided prior to the Seventh Circuit decision in *Cash Currency*, a decision upon which this court relies heavily and which is of greater precedential value. For these reasons, the court declines to adopt the holding in *Portland Metro*.

### ALTERNATE RELIEF TEST

■ The alternate relief test, a policy based analysis, has been suggested as a third test for determining eligibility for bankruptcy relief under section 109(b)(2). *In re Republic Trust & Sav. Co.*, 59 B.R. 606, 614 (Bankr.N.D.Okla.1986). In crafting the alternate relief approach, the court relied on the broad discretion vested in the

bankruptcy courts to serve the purpose and intent of the Bankruptcy Code. The test emphasizes "congressional intent and factors of practicality and policy" thereby combining elements of the state and independent classification tests and adding policy considerations. *Id.* In general, "courts should consider whether a bankruptcy proceeding is a satisfactory method, compared with available State and Federal non-bankruptcy methods, of reorganizing or liquidating a would-be debtor." *Id.* In essence is a Chapter 11 reorganization proceeding a satisfactory alternative to the statutory liquidation provisions of state law?

By proceeding under federal bankruptcy statutes, unsecured creditors of Maxicare Midwest receive the benefit of powers not available to the Regulators under the state statutes. For example, the committee of unsecured creditors appointed pursuant to section 1102 has authority under section 1103 to investigate the conduct and financial condition of the debtor. 11 U.S.C. §§ 1102, 1103. This committee is an active participant in the case and has the fiduciary duty to act in the best interests of all the unsecured creditors. No similar provision exists under the state insolvency procedures governing Illinois, Indiana or Ohio HMOs.

Illinois, Indiana and Ohio law grant a priority for payment of claims filed by HMO enrollees. This preferential treatment of loss claimants is anathema to the basic tenet of federal bankruptcy law. Equal treatment and distribution to all unsecured creditors is the heart of federal bankruptcy policy. The federal bankruptcy court, with its nationwide jurisdiction and its broad equitable powers, has the ability to reorganize the entire Maxicare network and to ensure equitable treatment for all creditors, not just creditors from Illinois, Indiana and Ohio. If the choice here is between a state liquidation of Maxicare Midwest and a global federal reorganization of the debtor and 47 related entities, the practical and policy factors support the conclusion that a proceeding under Chapter 11 is the preferred method of reorganizing Maxicare Midwest.

■ The Bankruptcy Code and Rules establish a nationwide, uniform and pervasive system for the reorganization of financially distressed companies. Corporations do business in many states where they maintain offices, own property and employ workers. They may operate through divisions or, as with Maxicare, through a system of wholly owned subsidiary corporations. Federal bankruptcy law applies uniformly to most business entities without regard to state law differences except where the bankruptcy court is obliged to adopt state substantive law. And even then it is the bankruptcy court in a bankruptcy proceeding which applies state law.

The clear policy of the Bankruptcy Code is for uniform laws. Debtors, creditors, shareholders and other interested parties need look only to federal bankruptcy law when issues of reorganization or liquidation arise. To permit some states to liquidate one segment of a multistate business leaving other parts of the business to be administered in a bankruptcy proceeding would lead to confusion, if not chaos, lack of consistency rather than uniformity, and uncertainty rather than predictability. The piecemeal administration of a complex multistate corporation may well deny a debtor the opportunity to effectively reorganize. Maxicare Midwest, operating in three states, and part of an integrated network of over forty subsidiaries, can and should be reorganized or liquidated within the jurisdiction of one court, the federal bankruptcy court. If states are allowed to decide which entities may be excluded from relief under the Bankruptcy Code a clear expression of Congressional intent must be evident. The words "domestic insurance company" found in section 109 evidence no such intent with respect to health maintenance organizations. This court is unwilling to give section 109 the expansive interpretation urged by the Regulators.

### MOTION TO DISMISS FOR CAUSE UNDER SECTION 1112(b)

The Regulators moved to dismiss Maxicare Midwest' petition for cause, pursuant to section 1112(b), on the ground that it was not filed in good faith. The Regulators allege that Maxicare Midwest was on notice that under Illinois, Indiana and Ohio law it is a domestic insurance company not entitled to be a debtor under the Code and that it represented in a Form 10–Q dated September 30, 1988, and filed with the Securities and Exchange Commission, that it would not file for bankruptcy relief. The court has determined that Maxicare Midwest is not a domestic insurance company and therefore is an eligible Chapter 11 debtor. Therefore, the remaining issue before the court is whether the debtor's misstatement of law contained in the Form 10–Q rises to the level of bad faith necessary to justify dismissal of this bankruptcy petition under section 1112(b).

■ The essential requirement for a good faith bankruptcy filing is a bona fide desire to reorganize. "Where the debtor is motivated by a legitimate reorganization purpose and not solely or predominantly by the desire to prevent foreclosure or hinder creditors, bad faith is not present." *In re Spenard Ventures, Inc.*, 18 B.R. 164, 167–68 (Bankr.D.Alaska 1982). The only evidence presented by the Commissioner was the statements in the Form 10–Q regarding the presumed ineligibility of some Maxicare affiliates to file bankruptcy.

■ The Bankruptcy Appellate Panel for the Ninth Circuit recognized the following factors which are usually present in cases not filed in good faith:

(1) The debtor has only one asset.
(2) The secured creditors' lien encumbers that asset.
(3) There are generally no employees except for the principals.
(4) There is little or no cash flow, and no available sources of income to sustain a plan of reorganization or to make adequate protection payments.
(5) There are few, if any, unsecured creditors whose claims are relatively small.
(6) There are allegations of wrongdoing by the debtor or its principals.
(7) The debtor is afflicted with the "new debtor syndrome" in which a one-asset equity has been created or revitalized

on the eve of foreclosure to isolate the insolvent property and its creditors.

(8) Bankruptcy offers the only possibility of forestalling loss of the property.

*In re Stolrow's, Inc.*, 84 B.R. 167, 171 (Bankr. 9th Cir.1988). The Regulators do not allege even one of these factors in support of the motion to dismiss Maxicare Midwest' petition as a "bad faith" filing. They simply rely on the statements contained in the 10–Q filing. That document included legal speculations and did not constitute a promise by any Maxicare affiliate to refrain from seeking bankruptcy relief. Such a promise to waive the right to file bankruptcy would be unenforceable. *In re Howe*, 78 B.R. 226, 228 (Bankr.D.S.D.1987). The misstatements of law contained in the debtor's Form 10–Q do not rise to the level of bad faith necessary to justify dismissal of Maxicare Midwest' petition pursuant to section 1112(b).

The Regulators failed to show that Maxicare Midwest had any improper motive for filing its Chapter 11 petition or to present any evidence of Maxicare Midwest' bad faith in filing for bankruptcy relief. Accordingly, this court denies the motion to dismiss for cause as a "bad faith" filing under section 1112(b).

## CONCLUSION

For the foregoing reasons, the court finds that Maxicare Midwest is an eligible debtor under 11 U.S.C. § 109 and that the debtor did not file this case in bad faith. Accordingly, the motions to dismiss are denied. This memorandum of decision incorporates the court's findings of fact and conclusions of law. Counsel for the debtor will prepare, lodge and serve an order denying the motions as required by Bankruptcy Rule 9021 and Local Rule 116(1)(a).